## FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**MARY JANE LAPOINTE**
**DANIEL LAPOINTE KENT**
Lapointe Law Firm, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KYLE HUNTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SUZANNE E. ESSERMAN, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1406-EX-441 |
| | ) | |
| REVIEW BOARD OF THE INDIANA DEPART- | ) | |
| MENT OF WORKFORCE DEVELOPMENT, and | ) | |
| INDIANA DEPARTMENT OF ENVIRONMENT- | ) | |
| AL MANAGEMENT, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE REVIEW BOARD OF THE
INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT
The Honorable Steven F. Bier, Chairperson
Cause No. 14-R-01005

**December 19, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Suzanne E. Esserman ("Employee") appeals a decision by the Review Board of the Indiana Department of Workforce Development (the "Board") denying her claim for unemployment benefits. Employee raises one issue, which we revise and restate as whether the record supports the Board's decision. We reverse.

FACTS AND PROCEDURAL HISTORY

Employee began her employment with the Indiana Department of Environmental Management ("Employer") on February 20, 1989, and her employment was terminated effective January 17, 2014, at which time her position was Senior Environmental Manager 1 within the Excess Liability Trust Fund (the "ELTF") section. The section reviewed claims submitted by owners and operators who had underground storage tanks, primarily gas stations, which leaked and were required to do remediation and cleanup of contaminants, and the ELTF program provided reimbursement for specific costs incurred in performing those cleanups. The source of funding for the ELTF program is derived from tank fees paid by owners and operators of underground storage tanks and from a per-gallon fee or tax placed on the distribution of gasoline. Employee began to work with the ELTF section on December 20, 2011.

Roberta Steiff, the ELTF Claims Section Chief for Employer, became Employee's supervisor in July of 2012. In October 2012, Steiff placed Employee on a work improvement plan to become more efficient in completing tasks. The improvement plan stated in part that Employee was expected to "complete claim triage on a minimum of 180 claims monthly, completing no fewer than 9 claims daily." Exhibits at 26. Employee's performance appraisal report for the review period of January 1, 2012 to

2

December 31, 2012, which was signed by Employee on June 10, 2013, indicated, under the heading "Performance Expectations/Goals," that Employee met expectations in four measurement categories, namely, document review and evaluation, review of completeness and accuracy of claim applications, final cost review decision packages, and providing guidance and support to others, and Employee did not meet expectations in two categories, namely, serving as backup to other senior level ELTF staff and completing special projects or assignments. In June 2013, Employer provided quota requirements to Employee. Steiff had Employee sign another performance appraisal report on June 10, 2013, which set forth certain expectations for Employee and stated in part:

> Document Review and Evaluation – Completes monthly Senior Quality Control reviews of no less than $1,400,000 dollars of claims submitted by cost reviewers within allotted time frames outlined by Rule and IDEM guidelines; reviews and evaluations are completed to ensure that the work performed and the results summarized in the reviewed documents are complete and consistent with State, IDEM, program area, and commonly accepted industry/technical policies, procedures and practices 90% of the time. Provides senior quality control reviews for claim decision packages for all claims. . . .
>
> Claims Processing and Management – Complete claim review of no less than $150,000 worth of claims on a monthly basis, averaging $150,000 to $300,000 over the course of the year. . . .

Exhibits at 41.

On December 17, 2013, Steiff sent an e-mail message to Employee, copying Craig Schroer on the e-mail, stating, "[a]s a reminder, the claim reviewer is responsible for verifying the time" and that, "[d]uring senior quality control, you should be verifying any time denials, looking for inconsistencies and making sure we followed the rule without

3

denials.  It is also important to verify large costs paid should be paid (bid items, drilling, etc.) since you will be the last one to review the claim with the back up in front of you."

Id. at 51.  Later that day, Employee sent a reply e-mail message to Steiff, copying Schroer, stating:

> Thank you for your feedback.  Can you please clarify a few points for me?
>
> Are you asking me to sign off on payment documents regarding claims that I have not fully reviewed?  As you know, I have found some discrepancies resulting in what would have been several thousand dollars in overpayments in claims from almost every claim reviewer in the Section.  I found these issues after the claim had been reviewed by at least (1), and usually, two (2) other claim reviewers.  For example, in the current claim that I am senior QC reviewing I have found almost $1,000 in changes in the first pay request alone from the review of timesheet information.  Apparently neither the initial nor the peer claim reviewer identified these issues.
>
> It is my understanding that the primary objective of senior QC reviews is to insure that every claim is as correct as possible before it leaves the Section.  In this way, public funds from the ELTF are expended appropriately and legally.  Since the ELTF expends approximately 50 million dollars annually, I think that every taxpayer has the right to believe that we are doing all that we can to make the best use of these public funds.
>
> I also believe that reviewing the timesheets and other associated backup documentation in the claims themselves is the best way to identify potential inappropriate payments and, thus, the misuse of taxpayer funds.  As you correctly state, I am the last person to review the claim with this backup in front of me.
>
> Having reviewed many kinds of financial documents, including invoices, involving both Federal and State funds for almost 25 years, I ethically cannot approve for payment documents which I have not fully reviewed.  I am particularly concerned about this situation, since almost every claim which I have reviewed has contained errors, some of which would have resulted in thousands of dollars in overpayments.
>
> As always, I am eager to do my best with any assignment which I receive.  In fact, I have found that senior QC reviews have provided me with a

4

wealth of information and, I hope, a way to contribute positively to the goals of the ELTF Claims Section. Again, thank you for the feedback and I look forward to your further directions.

Id. at 50-51. In reply to Employee's message, Steiff sent an e-mail message, copying Schroer, stating: "It is the responsibility of the claim reviewers, not the SEM 1, to verify time on a claim. I will remind the claim reviewers of their responsibility and work with them if they need clarification or help in this area. Please remain focused on your specific responsibilities with respect to claims." Id. at 50.

A Manager Evaluation completed by Steiff for the period of January 1, 2013 to December 31, 2013, indicated Employee did not meet the $1,400,000 expectation, noting that she completed no senior quality control reviews in "1/2 – 1/25," claims totaling $29,303.14 in "6/3 – 6/30," claims totaling $647,560.81 in the period of "7/1 – 7/31," no reviews in "8/1 – 8/15," claims totaling $17,775.04 in "10/21 – 10/31," claims totaling $272,868.32 in "11/1 – 11/30," and claims totaling $168,454.46 in "12/1 – 12/31." Id. at 46. The Manager Evaluation also indicated Employee did not meet the monthly $150,000 expectation, noting she completed claim reviews for claims totaling $39,295.34 in "1/2 – 1/25," no claims in "6/3 – 6/30," claims totaling $19,377.78 in "7/1 – 7/31," claims totaling $56,915.42 in "8/1 – 8/15," claims totaling $51,530.60 in "10/21 – 10/31," no claims in "11/1 – 11/30," and claims totaling $166,678.12 in "12/1 – 12/31." Id. at 47. Employer terminated Employee's employment for failure to meet work expectations.

Employee filed a claim for unemployment benefits, and a deputy for the Department of Workforce Development adjudication center issued a determination

5

denying Employee's claim on March 13, 2014. The deputy concluded that Employee was discharged for just cause under Ind. Code § 22-4-15-1(d) for a breach of duty in connection with work reasonably owed an employer by an employee. Employee appealed the deputy's determination, and a telephonic hearing was held before an administrative law judge (the "ALJ") on April 16, 2014, at which Employee, Steiff, and Bruce Palin, the Assistant Commissioner for the Office of Land Quality for Employer, testified and the parties submitted documentary evidence including performance appraisal reports for Employee and the e-mail exchanges between Employee and Steiff. Palin testified that Employee was terminated for not meeting work expectations and the primary issue was "being able to do [an] appropriate number of those types of reviews and evaluations within specific time frames." Transcript at 6. Steiff testified that the program reviews "5.5 million dollars per month," that "the performance expectations were written with some minimums for us to best reach that number," that "[p]erformance expectation for [Employee] was 1.4 million dollars of senior quality control review per month at a minimum on an average, and, you know, we, we did not achieve those numbers." Id. at 9. When asked about why there was nothing on the Manager Evaluation for a period of time after January 25, 2013, Steiff testified that Employee was on leave. Steiff testified that, when Employee returned to work in June, 2013, she "only came back for four hours a day" and that Employee "went out on medical leave again in August and returned on October 21st." Id. at 17. Steiff testified: "I don't know why [Employee] couldn't meet it. We tried to give her systems and ideas, you know, and get focused." Id. at 20-21. When asked if she thought it was reasonable to ask somebody to

6

carefully review those claims and check them for errors, Steiff testified "Yes. We have claim reviewers that were doing a more thorough review of that 1.4 million dollars." Id. at 21.

Employee testified that, when she was full-time, the quota requirements were "a relatively new procedure and [she] was pretty much kind of a guinea pig" and that when she left for a surgery her employer "actually had to hire two, and at the beginning, three staff to do [her] work, and when [she] came back . . . to work after [her] surgery, the first time, two people were doing that job full-time and [she] was getting a little bit of it." Id. at 23. Employee indicated she was out again for another surgery from September 3 until October 21, 2013. When asked "the senior quality control reviews . . . we have the dollar amount on these and . . . you didn't do any these before June . . . [i]s that right," Employee answered "[c]orrect." Id. at 25. Employee testified that, soon after she began as a senior quality reviewer, it became clear to her that a number of reviewers were not looking at any of the backup documentation, including timesheets, receipts, travel logs, and vehicle logs, and that at least one individual reviewer was simply not even reviewing claims and simply approving all costs. Employee testified that she believed "this was the only way that claims reviewers could make their quotas for these dollar amounts, and consequently, . . . I would look at it and find large numbers of costs that had been approved that should not have been approved, and that would then necessitate that I had to go correct the work and document the correction of work . . . ." Id. at 25.

Employee testified that she sent a number of e-mail messages to Steiff and her supervisor, Craig Schroer, regarding her concerns. She testified that she had been a

7

financial manager and a senior contract manager for Employer for decades, that she had reviewed pay requests and invoicing for almost twenty-five years, and that there were ethical and audit issues which she expressed several times. Employee testified that she continued to tell Steiff that she would do her very best to try to meet the goal and that she was working off the clock. Employee indicated that she discussed her performance and goals with Steiff and testified that she "was informed to just sign off and get them off my desk." Id. at 27. Employee testified that she "had every reason to believe [the claims] had large sums of money for payment that were not proper" and that she thought about "how easy it would be just to sign off when I knew that it was wrong." Id. She testified that her position was the last to see all of the backup documentation. Employee submitted a document, an "ELTF Program Claim QC Checklist" by Employee, as an illustration and the e-mail exchanges between her and Steiff set forth above. Exhibits at 49. Employee testified that she had been "finding large discrepancies and inappropriate payments" and that she "certainly was not comfortable signing off on claims that [she] had not reviewed because of these facts." Transcript at 31.

The ALJ issued a decision affirming the deputy's determination. In its decision, under the heading "Conclusions of Law," the ALJ found:

> [Employee] was discharged due to her lack of performance. [Employee] was not meeting the goals. [Employee] admitted that this was due to the amount of work she was putting in on the claims. However, [Employee] was going beyond what was expected of her. Even though [Employee] may have felt that she had an ethical obligation to check over everyone's work, this is not what she was instructed to do. [Employee] was expected to meet the goals set forward. [Employee] may have been working very hard to complete her work, but [Employee] was doing work that was not assigned to her. If [Employee] had simply done what she was supposed to

8

in the senior reviews, she would have had more time to complete her other tasks. [Employee's] failure to follow instructions, and instead do what she wanted, led to her not being able to meet these goals. [Employee] failed to show that it would not have been possible for her to complete the tasks if she had just been doing what she was instructed. [Employee] was discharged for just cause.

Exhibits at 53. Employee appealed from the decision of the ALJ, and on June 13, 2014, the Board issued a decision which affirmed the decision of the ALJ. The Board's decision incorporated by reference the conclusions of the ALJ with the following addendum:

> [Employee] breached a relevant duty owed to the Employer when she failed to obey her supervisor's reasonable instruction to conduct a senior quality review instead of the more in-depth claim review. By failing to obey her supervisor's instruction, she did not have sufficient time to devote to her other assigned tasks. The Employer discharged [Employee] for just cause for failing to meet the Employer's performance expectations as outlined in her work profile.

Appellant's Appendix at 2. Employee appeals from the decision of the Board.

## DISCUSSION

The issue is whether the record supports the Board's decision that Employee was discharged for just cause. Employee argues that she was not discharged for just cause pursuant to Ind. Code § 22-4-15-1(d) and that she did not breach a duty to her employer under the statute. She argues that there was no evidence that the work she completed was of poor quality or that she showed an intentional or substantial disregard for her employer's interests. She argues that the evidence is undisputed that she at all times gave her best effort to meet her performance goals and that her supervisor claimed she was too meticulous in her job duties. Employee contends that, based on the evidence, it is not

9

reasonable to conclude that her conduct rose to such an unacceptable level as to disqualify her for unemployment benefits. Employee also argues that she could have been held personally liable for knowingly presenting false claims to the State for payment, that she knew the claims were not accurate because her subordinate claims reviewers were not doing their jobs correctly, and that the evidence demonstrates that her superiors simply wanted her to approve claims without reviewing them.

The Board asserts that Employee deliberately disobeyed instructions from her supervisors and ignored explanations of the proper scope of her duties. The Board argues that the performance quotas were reasonable and that other employees achieved these metrics. The Board further argues that Employee knew that her failure to meet Employer's expectations could result in her discharge. The Board also argues that Employee's supervisors did not instruct her to submit false claims and that Employee was trying to complete tasks outside of her job description and was thus not reaching her necessary performance obligations. In her reply brief, Employee argues that her actions, even viewed in a manner most favorable to Employer, do not as a matter of law rise to the level of willful or wanton disregard of Employer's interest to deny unemployment benefits.

The standard of review on appeal of a decision of the Board is threefold: (1) findings of basic fact are reviewed for substantial evidence; (2) findings of mixed questions of law and fact—ultimate facts—are reviewed for reasonableness; and (3) legal propositions are reviewed for correctness. Recker v. Review Bd. of Ind. Dep't of Workforce Dev., 958 N.E.2d 1136, 1139 (Ind. 2011) (citing McClain v. Review Bd. of

10

Ind. Dep't of Workforce Dev., 693 N.E.2d 1314, 1318 (Ind. 1998), reh'g denied). Ultimate facts are facts that involve an inference or deduction based on the findings of basic fact. Id. (citing McClain, 693 N.E.2d at 1317). Where such facts are within the special competence of the Board, the Court will give greater deference to the Board's conclusions, broadening the scope of what can be considered reasonable. Id. (citing McClain, 693 N.E.2d at 1318).

In Indiana, an employee is ineligible for unemployment benefits if he or she is discharged for just cause. Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev., 735 N.E.2d 1197, 1202 (Ind. Ct. App. 2000), trans. denied; Ind. Code § 22-4-15-1.[1] Ind. Code § 22-4-15-1(d) delineates nine non-exclusive scenarios that can amount to "[d]ischarge for just cause," which include "any breach of duty in connection with work which is reasonably owed an employer by an employee." This basis for a just cause discharge does not explicitly condition a claimant's ineligibility on a requirement that the breach of duty must have been knowing, willful, or intentional. Recker, 958 N.E.2d at 1140. The breach of duty "ground for just [cause] discharge is an amorphous one, without clearly ascertainable limits or definition, and with few rules governing its

---

[1] Ind. Code § 22-4-15-1(a) provides in part:

[A]n individual who has voluntarily left the individual's most recent employment without good cause in connection with the work *or who was discharged from the individual's most recent employment for just cause* is ineligible for waiting period or benefit rights for the week in which the disqualifying separation occurred and until the individual has earned remuneration in employment equal to or exceeding the weekly benefit amount of the individual's claim in each of eight (8) weeks.

(Emphasis added).

11

utilization." Id. (quoting Hehr v. Review Bd. of Ind. Emp't. Sec. Div., 534 N.E.2d 1122, 1126 (Ind. Ct. App. 1989)).

> In considering whether an employer may utilize this provision as a basis for justifying its action, the Board should consider whether the conduct which is said to have been a breach of a duty reasonably owed to the employer is of such a nature that a reasonable employee of the employer would understand that the conduct in question was a violation of a duty owed the employer and that he would be subject to discharge for engaging in the activity or behavior.

Id. at 1140-1141 (quoting Hehr, 534 N.E.2d at 1126). "The duties reasonably owed to the employer by the employee may vary considerably depending on the circumstances." P.K.E. v. Review Bd. of Ind. Dep't. of Workforce Dev., 942 N.E.2d 125, 132 (Ind. Ct. App. 2011), trans. denied. The employer bears the burden of establishing a *prima facie* showing of just cause for termination, and if that burden is met, the burden shifts to the employee to introduce competent evidence to rebut the employer's case. Spieker v. Review Bd. of Ind. Dep't of Workforce Dev., 925 N.E.2d 376, 378 (Ind. Ct. App. 2010).

The record reveals that Employee was employed by Employer for nearly twenty-five years, that she had been a financial manager and a senior contract manager for Employer reviewing pay requests and invoicing for many years, that following a return from a medical leave of absence in June 2013 she was provided with quota requirements with respect to the completion of certain quality control reviews, namely, $1,400,000 worth of claims submitted by initial cost reviewers, and the completion of certain claim reviews, namely, $150,000 worth of processed claims per month, and that Employee did not meet those quota expectations. In addition to setting forth the quotas, the report signed by Employee on June 10, 2013, stated with respect to the senior quality control

12

reviews that evaluations were to be completed to ensure the results summarized in the reviewed documents were complete and consistent with State, IDEM, program area, and commonly accepted industry/technical policies, procedures and practices 90% of the time.

Employer terminated Employee's employment for failure to meet the quota requirements. Steiff indicated that there were claim reviewers that "were doing a more thorough review of that 1.4 million dollars." Transcript at 21. Employee testified that, when she returned from a medical leave of absence, two others "were doing that job full-time." Id. at 23. The Manager Evaluation completed by Steiff did not include any information from January 25, 2013, to June 3, 2013, Steiff indicated this was because Employee was on leave after January 25, 2013, Steiff testified Employee worked for four hours per day for a period of time after returning to work in June 2013, and Employee was out on medical leave again from September 3 until October 21, 2013. Employee testified that, soon after she began as a senior quality reviewer, it became clear to her that a number of initial reviewers were not looking at backup documentation such as timesheets and receipts and that at least one individual had been simply approving all costs. Employee believed this was the case because it was the only way that claims reviewers could meet their own quotas. Employee testified that she would "find large numbers of costs that had been approved that should not have been approved, and that would then necessitate that [she] had to go correct the work and document the correction of work." Id. at 25. Employee testified that her position was the last to see all of the backup documentation. Employee expressed concerns to her supervisors regarding the

13

accuracy of the claims she had been assigned to review; the record does not show these concerns were directly addressed by her supervisors; and Employee testified that she "was informed to just sign off and get them off my desk." Id. at 27.

The record suggests that, in an effort to reduce the administrative costs of processing claims by owners and operators for reimbursement under the ELTF program, Employer established quotas for quality control reviewers and claims reviewers and, at least to an extent, as a result the ELTF program, made overpayments based on claims which were not properly processed and reviewed. We note that there will always be a balance between efficiency and thoroughness in administering programs such as the ELTF program. Nevertheless, in addition to controlling administrative costs, it is in the interest of Employer to limit improper distributions for cleanup costs by ensuring that claims are processed accurately and that substantial overpayments exhausting limited resources are not authorized by reviewers and quality control reviewers. We further note that the report providing Employee with her quota expectations included in the record before the ALJ was signed by Employee on June 10, 2013, that she had returned from a medical leave of absence of approximately four months at around the beginning of June 2013, that Employee failed to meet most of her quotas in the months of June through December, 2013, and that Employee had another medical leave of absence from September 3 until October 21, 2013. While Employee may have failed to meet her quota requirements, leading Employer to terminate her employment of almost twenty-five years, we believe that much of this fact is accounted for by Employee's medical leaves. Additionally, we cannot say that a reasonable employee would understand that attempting

14

to process claims accurately leading to possibly significant savings to the ELTF, and especially considering that the employee would have been held responsible for inaccurate payments of claims or held liable or discharged for knowingly authorizing overpayments, would be considered a violation of a duty reasonably owed to Employer for the purpose of being ineligible for unemployment benefits.

Based upon the evidence and testimony above and in the record before the ALJ and Board, Employer did not meet its burden of establishing that Employee breached a duty reasonably owed Employer or showing that Employee's conduct was of such a nature that a reasonable employee of Employer would understand that the conduct was a violation of a duty owed Employer and the State of Indiana. Accordingly, we conclude Employee was not discharged for just cause and is entitled to unemployment benefits under her claim.

We also observe that a claim for unemployment benefits should not be confused with a wrongful termination lawsuit. To the extent Employer presented evidence that it had grounds not to continue Employee's employment, this evidence does not support the conclusion that Employee breached a duty reasonably owed to her employer under Indiana's statutes and caselaw governing unemployment compensation. See Conklin v. Rev. Bd. of Ind. Dep't of Workforce Dev., 966 N.E.2d 761, 766 (Ind. Ct. App. 2012) (noting that the Board's argument "blurs the line between the employment-at-will doctrine and the statutes and caselaw governing unemployment compensation," that the employer was not required to continue to employ the employee, and that a claim for unemployment benefits cannot be equated to or confused with a wrongful termination

15

lawsuit), <u>reh'g</u> <u>denied</u>. Employee did not breach a duty reasonably owed to Employer under Ind. Code § 22-4-15-1(d) and is thus eligible for unemployment benefits.

CONCLUSION

For the foregoing reasons, we reverse the Board's decision finding that Employee was discharged for just cause.

Reversed.

BAILEY, J., and ROBB, J., concur.